UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WASTE MANAGEMENT<br>OF LOUISIANA, L.L.C. | CIVIL ACTION |
| v. | NO. 13-226 |
| THE PARISH OF JEFFERSON<br>THROUGH THE JEFFERSON PARISH COUNCIL | SECTION "F" |

<u>ORDER AND REASONS</u>

Before the Court are Jefferson Parish's motion for summary judgment on liability and, in the alternative, its motion for partial summary judgment on damages. For the reasons that follow, the motion for summary judgment on liability is DENIED and the motion for partial summary judgment on damages is GRANTED in part and DENIED in part.

**Background**

This malicious prosecution lawsuit arises from earlier litigation in which Jefferson Parish sued Waste Management in an effort to early terminate the parties' Landfill Contract, so that Jefferson Parish could contract with another waste disposal services provider, River Birch.  Waste Management now contends before this Court that Jefferson Parish pursued the prior lawsuit for years, even though it knew that its claims against Waste Management were factually and legally baseless.  The record facts of this case, including prior litigation history, are necessarily presented here in detail.

1

Pursuant to a "Time Contract to Provide Services to Operate, Manage, and Maintain the Jefferson Parish Sanitary Landfill Site" (the Landfill Contract), Waste Management of Louisiana, L.L.C.[1] was to receive and dispose of waste for Jefferson Parish and also manage a portion of the Jefferson Parish Sanitary Landfill Site defined as the Expansion Area.  In exchange, Jefferson Parish paid Waste Management a per-ton "tipping fee".[2]  Additionally, Waste Management was also tasked with paying for the construction of all cells,[3] as well as paying for placing a final cover on all the cells when they were filled and the contract had reached its term. Based on the Expansion Area's capacity, the term of the Landfill Contract was to expire when certain permitted areas of the landfill, known as Phase IIIA and IIIB, were filled with waste.

_____

[1]In 1998 the Parish authorized John Sexton Sand & Gravel Corp. to assign the Landfill Contract to Waste Management.

[2]The Parish paid Sexton $2,000,000 for the initial cell development and the Landfill Contract provided that the remaining compensation was not to exceed the tipping fee multiplied by 240,000 tons per year for the long term construction, operation and maintenance of the remaining portions of Phase III.  The tipping fee was to be adjusted annually based on the consumer price index, or five percent, whichever is less.
     In addition to disposing of Parish residential waste at the landfill, Waste Management was allowed to dispose of Parish industrial and commercial waste and certain out-of-Parish waste, with the Parish's approval; for disposing of this waste, Waste Management was paid a separate tipping fee by those waste suppliers.  From the separate tipping fee, Waste Management was required to pay the Parish a royalty.

[3]"Cells" are waste units constructed within the permitted areas where waste is disposed.

Continuation of the Landfill Contract was contingent upon annual appropriation of the requisite funds by the Parish, as set forth in the Annual Appropriation Dependency Clause (ADC), a key provision in the context of this lawsuit:

> The continuation of this Agreement is contingent upon the appropriation of funds by the Jefferson Parish Council for the continued operation and maintenance of the Expansion Area.  If the Council fails to appropriate sufficient monies to provide for the continuation of this Agreement, the Agreement shall terminate on the last day of the fiscal year for which funds were appropriated.  Such termination shall be without penalty or expense to the Parish except for the payments which have been earned prior to the termination date.
> Upon termination of this Agreement prior to the end of its term, the Parish shall be relieved of its obligations under this Agreement except for payment of Service/Work already performed and [Waste Management] shall be relieved of its obligations to maintain and operate the Landfill.
> Termination of this Agreement by the Parish under the provisions of this section shall not constitute an event of default.  However, the Parish hereby consents to submit to the Parish the necessary appropriation language to be adopted to allow payment by the Parish.
> The Parish may effect such termination by giving [Waste Management] a written notice of termination.

It is Waste Management's position that the contours of this provision first became of interest to Parish officials in 2004 because Parish officials wished to divert the Parish's waste disposal business from Waste Management to its competitor, River Birch.

In early 2004, James "Dutch" Connick, who at the time was a consultant and lobbyist for Waste Management, says he was contacted by then-Jefferson Parish Chief Administrative Officer Tim Whitmer.

According to Connick, Whitmer said that then-Parish President Aaron Broussard was unhappy with Waste Management,[4] had met with representatives of River Birch, and that he wanted River Birch to operate the Parish landfill.[5]  According to Connick, Whitmer told him that Broussard wanted him (Connick) to know that River Birch would hire him (Connick) as its consultant and registered lobbyist.[6]

Months later, on October 11, 2004 then-Jefferson Parish Attorney Tom Wilkinson wrote a nine-page opinion letter to the Council[7] regarding the use of the ADC.  The Parish Attorney wrote:

> [I]t is the reasoned opinion of this office that the Annual Appropriation Dependency clause gives the Parish Council the discretion not to fund the [Landfill] Contract for fiscal years following the current fiscal year, at no cost or penalty to the Parish, as long as the Parish Council has a "good faith" basis for exercising its right not to fund the [Landfill] Contract.  Should

---

[4]Connick testified that Whitmer told him that Broussard was unhappy with the way Waste Management treated a friend of his, former Waste Management employee Bobby Bourgeois, and that River Birch would be a good partner.  (During his deposition, Whitmer denied that Broussard expressed to him an interest in contracting with River Birch in 2004).

[5]Whitmer did not convey to Connick any suggestion that the Parish residents would save money if the Parish diverted its waste disposal business to River Birch.  And, according to Connick, Whitmer indicated that the Parish "would let...Waste Management finish their contract."

[6](And, indeed, River Birch did hire Connick in early 2005 to be its consultant and registered lobbyist).

[7]The letter was addressed to Councilman Byron E. Lee; other councilmembers, as well as Broussard and Whitmer, were copied on the letter.

the Parish Council decide not to appropriate funds to provide for the continuation of the [Landfill] Contract for the next fiscal year, the [Landfill] Contract terminates on the last day of the fiscal year for which funds were appropriated.

Interpreting the language of the ADC, Wilkinson wrote:

Clearly, the Agreement only requires the administration to submit the necessary appropriation language for consideration by the Council, which then decides whether to fund the contract.  The Parish Council has the unfettered discretion to decide whether to fund the contract for the next fiscal year, or to not fund the contract and thereby evoke the [ADC]. [A]ny other interpretation of the [ADC] would create an illegal, unapproved future debt of the Parish, rendering the entire Agreement void and unenforceable *ab initio*.

In so opining, Wilkinson acknowledged that, absent an unqualified non-appropriations clause, multi-year service contracts such as the Landfill Contract constitute a debt that must be approved by the State Bond Commission.[8]  In support of his conclusion that a duty of good faith is imposed on a public entity choosing to exercise a non-appropriations clause, Wilkinson cited "the only reported Louisiana decision", <u>All American Assurance Co. v. State</u>, 621 So.2d 1129 (La. App. 1 Cir. 1993), summarizing the case as follows:

[T]he state entered into a five year lease for office space with RJV.  The State terminated the lease early after notifying RJV that public funding was inadequate to meet the rental obligations of the lease. [Paragraph] 28 of the lease [provided]: "In the event

---

[8]Wilkinson quotes La.R.S. 39:1410.60, which provides that no parish may incur debt without consent and approval of the State Bond Commission.  Wilkinson further observes in the letter that "[t]he Louisiana Attorney General has consistently opined that a contract containing a non-appropriations clause *does not constitute a debt requiring Bond Commission approval*." (emphasis in original).

that public funding by either federal or state governing is inadequate to meet the rental obligations of this lease, lessee may terminate the lease upon 60 days written notice."

The State asserted that funds were unavailable due to the financial crisis experienced in 1988 and that in terminating the lease it acted in good faith. RJV argued that the State failed to make a good faith effort to appropriate funds for the lease. Testimony established that in late 1997 the governor in an attempt to put the State on sound financial footing began to identify and recommend budget cuts. One of the proposals presented as a cost-saving measure was to identify unused or under utilized state-owned space for agencies currently leasing space. The decision was made to move the Dept. of Civil Service to state-owned property to eliminate costs of the RJV lease. The testimony established that the legislature was faced with a fiscal crisis and that massive budget cuts were viewed as part of the solution. Reduction of costs by consolidating offices and agencies and by utilizing state-owned property were believed to be appropriate and necessary. The court ruled that the state acted in good faith when, after recognizing a financial crisis and adopting cost-saving measures, it terminated the lease with RJV.

Notably, applying this good faith requirement, Wilkinson opined:

If a change in the financial condition of the Garbage District occurs, such a change in financial status may justify exercise of the non-appropriations clause. On the other hand, *attempting to exercise the non-appropriations clause under circumstances which simply result in a change in the identify of the contractor providing services, with no savings to the Parish, could open the Parish to legal challenges on the grounds no good faith basis existed for exercising the non-appropriations clause.*

(emphasis added). Wilkinson also mentions in his opinion letter a non-binding writ opinion in which the Louisiana Fifth Circuit Court of Appeals, enforcing an identical ADC in a Parish contract,

rendered judgment in favor of the Parish.[9]  Wilkinson emphasizes, in that case, "budgetary concerns were indisputably at the forefront of the Council's decision not to fund the contract." Summing up:

> While we cannot predict how a court might rule if budgetary concerns are not the motivating factor for the exercise of the right not to appropriate funds to continue a multi-year service contract, it is our reasoned opinion that the Council must have the unfettered discretion as long as it acts in good faith, not to fund the next fiscal year of the contract *for any reason*.

(emphasis in original).

At the Council's meeting two days later on October 13, 2004, a resolution to advertise a Request for Proposals for the Parish's waste disposal business was placed on the Council's agenda for the meeting, and Wilkinson made a presentation as to how the Waste Management contract could be terminated under the ADC.  At the meeting, Council Chairman John Young expressed his skepticism at the use of the ADC under the circumstances; he was concerned that using the ADC would subject the Parish to a breach of contract lawsuit by Waste Management.  Given his reservations, Young said he would expect Wilkinson to defend any such litigation that would

---

[9] There, the Parish early terminated a contract with SFS for the operation and maintenance of a Fire Training Center.  After the Parish invoked the ADC, it operated the training center with Parish personnel at substantial savings to the Parish.  SFS sued and argued that termination of the contract was for political rather than budgetary reasons, but the state appellate court held that a non-appropriation based on the lack of funds in the operating budget fell within the ADC.

result, rather than pass it off to outside counsel.  The Council voted to defeat the proposed resolution.

Meanwhile, sometime in 2005, Tim Whitmer's insurance company, Lagniappe Industries, began doing work for Shadow Lake Management Co., Inc., the umbrella corporation for River Birch.  This connection was not publicly disclosed.[10]  Broussard and Wilkinson also had connections to Lagniappe Industries: Broussard was a consultant for Lagniappe in 2009 and Lagniappe insured some of Wilkinson's rental properties.

In fact, the Parish would later select River Birch to provide waste disposal services. The circumstances and motivation giving rise to this selection are in dispute.  In 2008, a Parish recycling committee recommended that the Parish issue a Request for Proposal for the disposal of "yard and woody waste" to preserve capacity at the Parish Landfill.  The Parish Council approved the "woody waste" RFP 176.  But then the RFP was expanded to include all household and other waste.  The parties dispute how and why the scope of RFP 176 was expanded.  Waste Management submits that Broussard intervened behind the scenes and edited the RFP; an unusual level

_____

[10]Whitmer testified that, in 2005, he was unaware of the connection to River Birch; that is, when his company "wrote the insurance ... for Shadow Lake, which is apartment buildings owned by Fred Heebe...[u]nbeknownst to me, River Birch fell under that umbrella for health insurance purposes."  Whitmer testified that when he learned in 2009 that River Birch was connected to Shadow Lake, he did not immediately disclose it.

of involvement for a Parish president.[11]   Waste Management also submits that the edits were in fact authored by River Birch and provided to Broussard by Dutch Connick.[12]   The River Birch-edited RFP 176 solicited bids for the diversion of all waste; not just woody waste.[13]  Waste Management submits that because River Birch owned the only other landfill in the Parish permitted to handle the waste contemplated by the RFP, the RFP was tailored to River Birch, the only company which could possibly respond.

Two responses to the expanded RFP were received on December 9, 2008: one from River Birch, which proposed to accept all Parish waste at its facility, and one from Concrete Busters, which proposed to accept only woody waste.   Whitmer assembled an evaluation committee,[14] which had no input from the Environmental

---

[11]Whitmer testified that Broussard "did do some changes to" the RFP and that it was "unusual" for Broussard to edit an RFP.

[12]Wilkinson testified that "at some point the River Birch people ... approached Mr. Broussard about expanding the RFP to include a comprehensive look at the entire landfill"; he also stated "I know River Birch provided us a proposed RFP, that I believe was given to Mr. Whitmer....."

[13]Waste Management points out that Finance Director Gwen Bolotte testified that, inexplicably, she was asked by Whitmer to "push it through".

[14]Waste Management submits that the committee was assembled by Whitmer in violation of a Parish ordinance by stacking the committee with three attorneys (chaired by Wilkinson) and excluding any member of Environmental Affairs, Purchasing, or anyone with waste disposal experience.   Wilkinson scored the bids and consulted no one other than the other two attorneys on the evaluation committee.

Affairs and Finance Departments. The evaluation committee performed no analysis comparing the cost to the Parish of the River Birch proposal versus the cost of the Waste Management Landfill Contract, and no cost analysis was requested by the Council.  Nor was any analysis performed to address how the Parish could early terminate its contract with Waste Management.  Nevertheless, on January 14, 2009 the Parish Council selected River Birch to provide waste and other disposal pursuant to RFP 176.  Pursuant to Resolution No. 111491, the Administration was to negotiate a contract with River Birch to be submitted to the Council in complete form, including all terms and conditions, for ratification by Council Resolution prior to the execution of the contract.

The Parish began contract negotiations with River Birch. Between January and June 2009, the Parish also sought to obtain an agreement from Waste Management to terminate the Landfill Contract. Michael Peytavin and the law firm of Gaudry, Rason, Higgins & Gremillion, L.L.C. were selected to negotiate the contract with River Birch as well as to resolve the contract with Waste Management.  Wilkinson and Peytavin conducted negotiations with Waste Management through its attorney Gerald Walter.

During the course of negotiating the River Birch contract, Peytavin and Wilkinson attended meetings with Marnie Winter, head of Parish Environmental Affairs, and Rick Buller, Landfill

Engineer.[15]  With respect to negotiated terms, River Birch demanded a higher tipping fee ($21.50 per ton) than the tipping fee Waste Management was paid ($20.66 per ton).  River Birch insisted that its own contract not include an ADC, and also insisted that its contract include a covenant that would completely bar the Parish from using its own landfill to accept any waste through the 25-year contract term.  It was Peytavin's view that some of these proposed contract terms for River Birch would render the River Birch contract legally invalid; he advised Wilkinson of his concerns by letter dated March 4, 2009.

On March 27, 2009, by letter to the Parish Council, Wilkinson explained the progress of the proposed River Birch contract and its impact on the existing Landfill Contract with Waste Management. Wilkinson represented that the Landfill Contract could be terminated under the ADC, but that Waste Management would likely argue that it had no obligation to place final cover.  "The Parish does not want to place itself in the position of having to bear the cost of installing final cover on Phase IIIA and IIIB because of a breach of the contract with Waste Management," Wilkinson advised.

Meanwhile, on April 16, 2009 Parish Landfill Engineer Buller had emailed Peytavin and Wilkinson the first cost analysis

---

[15]Waste Management disputes this, suggesting that "voluminous evidence calls into question the testimony of Mr. Wilkinson and Mr. Peytavin regarding the meetings they allege took place."

11

comparing the cost of continuing the Waste Management Landfill Contract to the cost of the Parish contracting with River Birch. (Waste Management submits that Mr. Buller testified that the Landfill Budget Scenario analysis was not a comparison of the costs to the Parish of the Waste Management contract to the costs to the Parish of the River Birch contract). The Landfill Budget Scenario spreadsheets, which were prepared at Wilkinson's request and finalized May 5, 2009, showed three years of cost savings to the Parish if it contracted with River Birch instead of continuing to use the Parish Landfill. Whether or not the Parish actually would enjoy cost savings if it contracted with River Birch instead of Waste Management is vehemently disputed.

On June 5, 2009 Wilkinson again wrote to Broussard and the Parish Council to update them on the negotiations with River Birch and Waste Management. Wilkinson notes that the Parish and River Birch would like their contract to commence on January 1, 2010, but that early termination of the existing Landfill Contract with Waste Management would be required to effect the January 1, 2010 start date. After summarizing the Parish and Waste Management's positions on negotiating a termination, Wilkinson explains that litigation may be required with Waste Management because the parties are "at an impasse" and "[t]he only way to resolve the impasse without exposing the Parish to potential liability for lost profits, or relieving Waste Management of responsibility for the

final cap, is to seek a judicial determination of the rights and obligations of the parties."  As a result, Wilkinson advises the Council that he had drafted a Petition for Declaratory Judgment and Damages[16] and he recommended immediately filing the petition as an additional impetus for Waste Management to agree to early termination, or so that the Parish could obtain a judicial resolution in advance of the preferred January 1, 2010 contract date with River Birch.

On June 17, 2009 Mr. Peytavin wrote to then-Councilman At Large, John Young, explaining that the ADC would be included in the River Birch contract as a matter of law and explaining that "the commencement date of the River Birch Time Contract is suspended until such time as there is a ... final judgment in favor of the Parish or a voluntary termination of the existing [Landfill Contract]."

Several days later on June 22, 2009 Wilkinson sent a letter to the Council, explaining the status of negotiations with Waste Management, advising that the ADC may be used to terminate the Landfill Contract without penalty to the Parish, and also advising why contracting with River Birch would be in the Parish's best interest.  From a cost-saving standpoint, Wilkinson submitted a

---

[16]Among other things, Wilkinson explained that Waste Management may be liable to the Parish for penalties of approximately $80,000,000.00 because it failed to resume twice weekly collections after Hurricane Katrina until October 24, 2005.

version of Buller's Landfill Budget Scenarios analysis, which compared costs to the Parish of "no change" (that is, continuing to use the Parish Landfill and keeping the contract with Waste Management) versus contracting with River Birch.  The spreadsheet estimated that, if it contracted with River Birch, the Parish would save money in the amount of $1,485,633 in 2010; $1,427,340 in 2011; and $413,902 in 2012.  Waste Management submits that, by providing this "cost-savings" analysis to the Council, Wilkinson presented a knowingly and blatantly incorrect[17] analysis in that: (a) cell construction costs were improperly included as a cost to the Parish and removing those costs as a cost to the Parish negated any alleged savings to the Parish;[18] (b) the analysis accounted for only a $700,000 royalty owed to the Parish under the Waste Management contract, whereas the royalty averaged $2,000,000 between 2002 and 2005 and had never been below $1,000,000 for any given year; and (c) Wilkinson represented in the letter to the Council that extrapolated savings projected over 22 years with River Birch were "conservatively projected" at $18,000,000 to $21,000,000, despite Landfill Engineer Buller telling Wilkinson that "that wasn't a

_____

[17]Buller testified that the Environmental Affairs Department told Wilkinson about the flaws with his analysis.

[18]The "no change" analysis utilizes the Waste Management tipping fee and also includes all cell construction costs ($1,500,000 in 2010 and $1,600,000 in 2011) as additional costs to the Parish.  However, pursuant to the Landfill Contract, all cell construction costs were paid by Waste Management and were built into the tipping fee.

valid extrapolation."[19]   Wilkinson opined that "significant cost savings are possible under the River Birch scenario."

Not only did Mr. Buller advise Wilkinson about the flaws of his extrapolation over 22 years, he also advised that more time was needed to analyze the impact of contracting with River Birch. Notably, Parish Finance Director Bollette testified neither she nor anyone in her department was ever consulted in any way regarding the financial analysis purporting to show savings to the Parish.[20] In fact, during the Council meeting in which Wilkinson announced the alleged savings, she was "startled, surprised" by the numbers; she raised her hand and said "The Finance Director had ... no involvement [with] these calculations at all."

Two days later on June 24, 2009 the Parish Council passed a resolution ratifying the River Birch contract.   Among its terms,

---

[19]Waste Management submits that the record calls into question the method used to project savings, as well as Wilkinson's representation that the Parish would save millions by not having to pay to locate a drainage canal: the projected savings figure for 2013 to 2025 was arrived at by simply multiplying the projected savings over the next 22 years of the River Birch contract; and, Wilkinson's representation in the letter to the Council that the Parish would save an additional $5.5 million with River Birch by not having to pay to locate a drainage canal was not a true savings because the Parish must bear that expense if it ever used its landfill again.

[20]The Parish submits that Young testified that he was advised by Whitmer that the Parish would save $25 million over the course of a long-term contract and save the landfill asset for future generations; Young says he was told that Whitmer had run the numbers with Marnie Winter and Rick Buller and that neither (Winter nor Buller) controverted the savings figures until after a federal investigation had begun.

the River Birch contract: included the servitude agreement prohibiting the Parish from disposing of any waste at (and thus closing) the Parish Landfill for 25 years; did not include an ADC; and included a provision that, if Waste Management refused to early terminate the Landfill Contract, the Parish would seek a declaratory judgment that it may terminate the contract pursuant to the ADC.

Negotiations with Waste Management continued,[21] but ultimately failed to result in a voluntary resolution of the Landfill

---

[21]By letter dated July 27, 2009, Wilkinson updated the Council regarding the Parish's negotiations with Waste Management. He also offered this opinion:

> This office believes that the Parish has a solid claim that Waste Management breached the disposal contract and thus will be precluded from claiming lost future profits. Waste Management is undoubtedly aware that if the Court finds that it did breach the disposal contract the Court can declare that the contract is terminated for cause and assess damages against Waste Management. These damages are in addition to the penalties of approximately $80,000,000.00 which may be assessed against Waste Management under the collection contract. This office is confident that the Court could assess a substantial percentage of the penalty sought by the Parish for post-Katrina violations of the collection contract.... In the opinion of this office the proposed concessions to be made by the Parish with respect to waiving overpayments under the Landfill Contract ($3,000,000.00) and stipulated damages under the Collection Contract ($80,600,000.00) have not been appropriately taken into account by Waste Management....

16

Contract.[22]  On August 21, 2009 the Parish sued Waste Management in state court, seeking a declaratory judgment as well as liquidated damages and recovery for overcharges.  Jefferson Parish sought, among other things,[23] a declaration as to its right to early terminate the contract under the ADC.  Invoking the funding clause, the Parish sought a declaratory judgment that "in the event the Parish Council decides not to appropriate funds for the fiscal year 2010 for continuation of the Landfill Contract, the Landfill Contract shall be deemed terminated without penalty or expense to the Parish...."  Also named as defendants, because they had each issued performance bonds guaranteeing the obligations of Waste Management under the Collection Contract and the Landfill Contract,

---

[22]By letter dated August 6, 2009 Wilkinson gave Walter the Parish's "final offer" subject to the Council's approval. A few days later, it appeared that Waste Management was agreeable to those terms.  Wilkinson followed up with an August 12, 2009 letter, noting that a June 30, 2010 termination date would not be agreeable; that "the Parish insists on termination as of December 31, 2009 in order to take full advantage of savings available under the River Birch scenario...."  On August 21, 2009 Wilkinson wrote Walter again:

> [Y]ou confirm that Waste Management agrees to all of the proposed terms and conditions set forth in my letter of August 12, with the exception of the closing date....  As I made it clear to you yesterday, I have no intention of presenting Waste Management's August 20, 2009 proposal to the Council.  Further, as discussed today, please find enclosed a copy of the suit filed on behalf of the Parish....

[23]Jefferson Parish also alleged that Waste Management breached the Landfill Contract.

17

were Travelers Casualty and Surety Company of America and Evergreen National Indemnity Company.  The Parish asserted that the sureties were liable *in solido* with Waste Management for amounts claimed by the Parish under those contracts (up to the amounts stated in the performance bonds).[24]  Travelers removed the early termination lawsuit to another Section of this Court on September 14, 2009.[25]

Meanwhile, in late 2009, it was reported that Tim Whitmer's insurance company, Lagniappe Industries, had been doing undisclosed business with numerous Parish contractors, including Shadow Lake Management Co., Inc., the umbrella corporation for River Birch. Broussard and Wilkinson, who also had ties to Lagniappe, recused themselves from the Parish investigation into Whitmer.  In January 2010 Whitmer then Broussard resigned amidst allegations of corruption and impropriety; Wilkinson resigned in March 2010.  A federal criminal investigation began in January 2010.  Thereafter, Wilkinson, Whitmer, and Broussard entered guilty pleas to federal criminal charges.[26]

---

[24]Waste Management was contractually obligated to pay any attorney's fees that Travelers and Evergreen incurred.  James C. Gulotta, Jr. of Stone Pigman represented the sureties and sent the legal bills directly to Waste Management for payment.  Waste Management paid Stone Pigman for all work performed by Stone Pigman in defending the sureties.

[25]While Gerald Walter of Taylor Porter represented Waste Management prior to initiation of litigation, Waste Management hired Frilot, L.L.C. to represent it in the termination lawsuit.

[26]The Parish takes issue with Waste Management's submission of newspaper articles as the backdrop for the Parish

Nevertheless, Jefferson Parish continued its termination litigation against Waste Management and, unsurprisingly, settlement talks stalled in December 2009.  On July 22, 2010 Jefferson Parish filed an amended complaint, in which it admitted that it had a pending contract with a competing waste services provider, River Birch, Inc., which, the Parish said, would result in "substantial savings".  It was for this stated reason that the Parish claimed it sought to terminate the Landfill Contract and instead contract with River Birch. By the amended complaint, the Parish sought a declaration that:

> if the Parish Council does not appropriate funds for fiscal year 2011 for continuation of the Landfill Contract with Waste Management in order to take advantage of the substantial annual savings available to the Parish by contracting with River Birch, Inc. and Highway 90, LLC to provide disposal services in lieu of continuing to operate the Parish landfill under contract with Waste Management, then the Landfill Contract between the Parish and Waste Management is terminated effective January 1, 2011 without penalty or expense to the Parish except for tipping fees earned by Waste Management prior to the termination date.

The Parish submits that it added this request for a declaration of rights as to funding the landfill budget for 2011 because the request for a declaration of rights with respect to the 2010 budget had been declared moot by another Section of this Court on the

---

scandal.  The Parish does not controvert the facts as submitted by Waste Management, however.  Rather, the Parish emphasizes that there is no evidence of any illegal activity by Parish officials with respect to the underlying litigation or the River Birch contract.

basis that the landfill had already been funded for 2010.[27]

Even after it filed its amended complaint in mid-2010, in which Jefferson Parish disclosed its contractual relationship with River Birch and that relationship to the Waste Management litigation, and even after it had approved a budget that included funding for the 2010 Landfill Contract with Waste Management, Jefferson Parish continued to press the appropriateness of its use of the ADC on the basis of funding and cost savings to terminate Waste Management. Up to that point, the only financial analysis that had been undertaken comparing the competing waste disposal contracts was the Landfill Budget Scenarios analysis, which showed three years of cost savings.[28]

---

[27]In fact, Waste Management submits that it was problematic to the Parish that the landfill budget was over-funded for 2010. Because the funding existed for the 2010 budget, during the process of drafting the 2010 budget in late October 2009, Whitmer intervened by calling the Parish's Finance Director and asking her to move the funding for the Waste Management Landfill Contract from the Landfill Disposal Fees line item of the budget (the line item used to pay the Parish's waste disposal contractor) to the Professional Services line item (the line item associated with other types of fees, but never at amounts paid to the Parish's waste disposal contractor). This would have supported a position of non-appropriation. Landfill Engineer Rick Buller testified that he was "mystified" by this maneuver; he testified that, at the time, he told Winter "this is screwy", and that he did not know why at the time the waste was budgeted like that. Later, after scandal erupted in the Parish Administration, Whitmer told Bolette to reverse the line item flip-flop, and the funds for the Waste Management contract were included in the 2010 budget.

[28]As noted, Waste Management contends that the methodology underlying the finding of any cost savings was, at best, misleading, and also notes that Wilkinson's savings extrapolation

River Birch had commissioned an "Analysis of Proposed Contract Between Parish of Jefferson and River Birch, Incorporated", which was completed by LSU Professor Emeritus of Economics Loren C. Scott in July 2010. Dr. Scott concluded that the Parish would save $206,220,000 to $253,520,000 over 25 years by contracting with River Birch and closing the Parish Landfill.[29] But in light of the questions that arose with regard to the conduct of Parish officials, the Parish Administration wanted to retain an independent expert to conduct a financial analysis comparing the cost of continuing the Landfill Contract to the cost of entering the River Birch contract. On July 7, 2010 the Parish hired Postlethwaite & Netterville to perform a landfill option financial analysis; it took several months to complete.

In late 2010 Waste Management continued to defend against Jefferson Parish's lawsuit, including taking depositions of Parish officials.[30] In January 2011 the P&N study was completed; contrary to the opinion commissioned by River Birch, the results of the P&N

_____

for 20+ years was inaccurate.

[29]Waste Management submits that an impartial economist could not have reached a conclusion that the Parish would save money with River Birch.

[30]John Young testified that he relied on Interim Parish Attorney and outside counsel to review the Waste Management litigation; however, Interim Parish Attorney Peggy Barton testified that she was not asked to review the lawsuit against Waste Management after the scandal broke, nor did she ask Peytavin to review it.

21

study concluded that the River Birch contract would in fact cost, not save, the Parish money.[31]  Specifically, the P&N report stated that the River Birch contract would cost the Parish between $6 million and $39 million more than if the Parish continued to dispose of its waste at the Parish Landfill.  Even with this turn of events, Jefferson Parish continued to press its termination lawsuit for nearly another year.[32]

Meanwhile, the Parish continued to juggle the Landfill Contract litigation with the River Birch contract.  It was the Parish's position that the Waste Management litigation could not be dismissed because River Birch maintained that it still had a valid contract.  For his part, Young stated that he instructed the Parish Attorney to prioritize looking for a way to cancel the River Birch contract.  On January 26, 2011 Assistant Parish Attorney Jeremy Dwyer sent a memo to Parish Attorney Deborah Foshee outlining the options discussed during a January 21, 2011 meeting concerning the River Birch contract.  Among the options, Dwyer discussed "the 'do nothing' approach", which would "let everything play out on its

---

[31]On March 16, 2011, at River Birch's request, the Parish Council held a public meeting at which Dr. Scott presented his findings on behalf of River Birch and P&N presented its findings.

[32]Parish President John Young publicly acknowledged the veracity of the report and in particular the report's conclusion that contracting with River Birch would cost the Parish money.  In response to the report, Mr. Young also publicly directed the Parish's attorney to investigate options for cancelling the River Birch contract.

own" given that "Waste Management has already begun to lead the charge to have the River Birch contract cancelled by the courts."[33] A fourth option was that the Parish could pursue yet another declaratory judgment, this time with respect to its contract with River Birch. Dwyer noted that the Parish could advance "two strong arguments" toward having the River Birch contract declared null and void: (1) because the Parish entered into an exclusive agreement for landfill purposes, it was required to use the public bidding process, which it did not; (2) because the River Birch contract is a multi-year debt-inducing contract, it must contain a non-appropriations clause, which it does not.

In April 2011 the Parish and Waste Management entered into a partial settlement agreement in which the parties released certain pending damage claims.[34]   But the Parish specifically reserved its

---

[33]On February 23, 2011 Waste Management filed its first amended and supplemental counterclaim, seeking a declaration invalidating the River Birch contract based on information obtained from the Parish in discovery (regarding the alleged improper influence of River Birch and the improprieties with RFP 176).

[34]Paragraph 12 provided:

The Parish of Jefferson ... and Waste Management hereby direct their respective counsel to file appropriate motions to dismiss with prejudice all pending claims for damages, costs, expenses and attorneys fees in the action in USDC for the Eastern District of Louisiana ... [Civil Action] No. 09cv6270, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, with each party to bear its own costs.

right to pursue its ADC claim; Waste Management, by its counterclaim, maintained its pending request for a declaration that the River Birch contract is invalid.

And then, two and a half years after the River Birch contract was signed, on November 29, 2011, Jefferson Parish filed suit for declaratory judgment against River Birch in state court, in which it sought to void the River Birch contract. The grounds for voiding the contract included those before mentioned by Mr. Peytavin in his March 4, 2009 letter, as well as those options mentioned by the Assistant Parish Attorney in the January 26, 2011 memo: the contract is an exclusive franchise required to be bid pursuant to Louisiana law; the contract is void as it incurs a debt without the consent of the State Bond Commission; the contract is void for lack of consent. Shortly thereafter on December 15, 2011 Jefferson Parish and River Birch entered into a consent judgment in the state court lawsuit, which voided the River Birch contract. Specifically, the state court consent judgment provides:

> The Contract among Jefferson Parish, River Birch Incorporated, and Hwy-90, LLC was signed by the Parish on June 30, 2009, by River Birch Incorporated on September 15, 2009, and by Highway-90, LLC on September 15, 2009. The Covenant was signed on September 23, 2009, and was recorded in the Jefferson Parish Conveyance Book as Instrument Number 1046573. **The Contract is not in effect because a suspensive condition contained in Paragraph 36 of the Contract has not been met. <u>The parties acknowledge that the suspensive condition cannot be met.</u>** Considering the foregoing, the Contract is hereby declared null, void, and of no effect.

24

(emphasis added).[35]

Finally, in January 2012, after the Parish made both public and judicial acknowledgments that its ADC claim against Waste Management could not succeed, Jefferson Parish asked for a voluntary dismissal with prejudice of its lawsuit against Waste Management.  At first, Waste Management opposed the request. However, on February 6, 2012 Waste Management joined in the request for voluntary dismissal; by this motion, Jefferson Parish and Waste Management jointly understood the federal court could dismiss the Parish termination lawsuit; they acknowledged that the Jefferson Parish/River Birch contract had been declared null and void by the state court; and the parties agreed that the Parish's request for declaratory relief was rendered moot by the Parish/River Birch consent judgment; in fact, the motion for voluntary dismissal attached a copy of the consent judgment.  The Parish and Waste Management also stipulated that

> Waste Management has neither pled nor asserted in any of
> its pleadings in this litigation including counterclaims,
> a claim of malicious prosecution or bad faith litigation
> against the Parish in connection with this litigation,
> and the Parish agrees that it shall at no time assert a

---

[35]Paragraph 36 of the River Birch contract, entitled Suspension of the Commencement Date of Time Contract, provided that the parties acknowledged that the River Birch Time Contract could not commence unless and until the Parish succeeded in obtaining a declaratory judgment that the Landfill Contract with Waste Management could be terminated by the Parish by utilizing the ADC or because of breaches by Waste Management, or unless and until Waste Management and the Parish voluntarily agreed to terminate the Landfill Contract.

> defense based on *res judicata* as to any [such] claim,
> which Waste Management may assert in future litigation.[36]

It was not until February 7, 2012, approximately two and a half years after Jefferson Parish originally sued Waste Management, that another Section of this Court granted the joint request, and dismissed Jefferson Parish's case with prejudice.

It is against this bloated backdrop that on February 6, 2013 Waste Management filed the pending lawsuit against Jefferson Parish, alleging malicious prosecution and seeking to recover, as damages, attorney's fees and costs. Waste Management now charges in this Court that Jefferson Parish maliciously initiated and pursued its claims against Waste Management for early termination of the Landfill Contract, all the while knowing that its claim was factually flawed and baseless in law. Jefferson Parish at first requested dismissal of Waste Management's initial complaint for

---

[36]Waste Management alleges that its agreement to join the Parish's request for voluntary dismissal

> was not the result of any sort of settlement
> or compromise. To the contrary, Waste
> Management only agreed to jointly move for
> voluntary dismissal of Jefferson Parish's
> appropriation dependency clause claim because
> the motion was for dismissal with prejudice
> and it contained the acknowledgment by
> Jefferson Parish that the Consent Judgment ...
> in which Jefferson Parish acknowledged that it
> could not succeed in its appropriation
> dependency clause claim against Waste
> Management ... was fatal to Jefferson Parish's
> claim. In fact, Waste Management expressly
> reserved its right to bring a malicious
> prosecution claim against Jefferson Parish....

failure to state a claim upon which relief can be granted.   But on March 27, 2013 the Court denied without prejudice the motion to dismiss, and permitted Waste Management to file an amended complaint.   On April 3, 2013 Waste Management filed its amended complaint, in which it alleges that the dismissal of the Parish's claim on February 7, 2012 was a dismissal based on and reflecting the lack of merit of the Parish's claim, and that the dismissal constituted a bona fide termination of the Parish's appropriation dependency clause claim against Waste Management; all in Waste Management's favor.

Jefferson Parish again sought dismissal of Waste Management's amended complaint for malicious prosecution on the ground that it failed to state a claim upon which relief may be granted.   On June 3, 2013 the Court denied the motion.   The Parish now seeks summary judgment on liability and, if the motion is denied, it seeks partial summary judgment on damages.

### I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.   No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.   See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).   A genuine dispute of

fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. <u>See</u> <u>id.</u>  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. <u>Id.</u> at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. <u>See</u> <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. <u>Id.</u>  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255.

II.

*A.*

To succeed on a claim for malicious prosecution under Louisiana law, a plaintiff must prove by a preponderance of the evidence these essential elements:

(1) the commencement or continuance of an original criminal or civil judicial pleading;
(2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding;
(3) its bona fide termination in favor of the present plaintiff;
(4) the absence of probable cause for such proceeding;
(5) the presence of malice therein; and
(6) damages conforming to legal standards resulting to plaintiff.

Hibernia Nat'l Bank of New Orleans v. Bolleter, 390 So.2d 842, 843 (La. 1980).[37]   The Parish submits that there is no evidence of malice and, therefore, it is entitled to summary relief dismissing Waste Management's lawsuit. Although ordinary summary judgment principles apply, summary judgment is seldom appropriate for determinations concerning subjective intent issues such as motive, good faith, and malice.   See Smith v. Our Lady of the Lake Hosp., Inc., 639 So.2d 730, 751 (La. 1994)(citation omitted).

"Malice can be inferred when the evidence shows that 'the

---

[37]Because Louisiana public policy guarantees that people acting in good faith shall have access to courts to redress wrongs, malicious prosecution lawsuits are disfavored; indeed, "in order to sustain them, a clear case must be established, where the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent."   Johnson v. Pearce, 313 So.2d 812, 816 (La. 1975)(quotation omitted).

claimant acted with absence of caution and inquiry that a person should employ before filing suit'"; and "malice exists when there is 'knowledge that is false or a reckless disregard for the truth.'" <u>Wiley v. Wiley</u>, 800 So.2d 1106, 1110 (La.App. 3 Cir. 2001)(citations omitted). The Louisiana Supreme Court has cautioned:

> [M]alice does not submit readily to definition.... Any feeling of hatred, animosity, or ill will toward the plaintiff, of course, amounts to malice.... But it is not essential to prove such ill will. Malice is found when the defendant uses the prosecution for the purpose of obtaining an unfair advantage, for instance, as a means to extort money, to collect a debt, to recover property, to compel performance of a contract, ...or as an experiment to discover who might have committed the crime....

<u>Miller v. East Baton Rouge Parish Sheriff's Department</u>, 511 So.2d 446, 453 (La. 1987)(internal quotations and citations omitted). Thus, although the mere negligent institution of a lawsuit is insufficient to establish malice, <u>Dupre v. Marquis</u>, 467 So.2d 65 (La.App. 3d Cir. 1985), showing improper motive suffices to establish malice. <u>See</u> <u>Johnson v. Fairmont Roosevelt Hotel</u>, 286 So.2d 177, 179 (La.App. 4 Cir. 1973). "[I]t is not necessary to prove any actual spite, ill-will or grudge, for one having no ill-will against another may, notwithstanding, be guilty of the malicious prosecution of him." <u>Buisson v. Prestia</u>, 45 So.2d 531, 533 (La.App. 1950).

As a defense to a malicious prosecution claim, a defendant may invoke its good faith reliance on the advice of counsel, which

negates the presence of malice.  This advice of counsel defense applies only if (1) the advice was relied upon in good faith, (2) the advice relied on was legal advice, and (3) the advice was given "after a full and fair statement of all the facts."  See McClanahan v. McClanahan, 82 So.3d 530, 537 (La.App. 5 Cir. 2011); see also Brooks v. Bank of Acadia, 138 La. 657 (1916)(holding that "[a]dvice of counsel, even though erroneous, on questions of law, is a shield against charges of malice and bad faith").

*B.*

The Parish submits that there is no evidence in the record supporting a finding of malice; it also seeks safe harbor by invoking the good faith reliance-on-counsel defense.  Waste Management counters that genuine disputes concerning the material fact of the Parish's motives in instigating and pursuing the termination lawsuit preclude summary judgment; the controversies in the record, Waste Management submits, are sufficient to withstand the Parish's request for summary relief.  Having carefully considered the voluminous record, the Court agrees.

The Parish submits that "[t]here is ample evidence that Parish Attorney Wilkinson, together with outside counsel Mr. Peytavin, advised the Council as to the law concerning the Appropriation Dependency Clause[], based upon the cost savings analysis prepared by the Parish Landfill Engineer" and that the Council acted on this advice and chose to institute the underlying litigation.  By

oversimplifying the bulky record and glossing over circumstantial evidence that could permit an inference of bad faith, the Parish fails to establish beyond factual dispute that it did not act with malice in instigating the underlying litigation, or that it indisputably relied in good faith on its counsel.[38]

Among the many unresolved factual controversies, the parties continue to debate: whether the personal agendas or business relationships of Administration officials tainted the Parish's decision to attempt to divert its waste disposal contract to River Birch and its later lawsuit against Waste Management; whether the Parish's reliance on the lone 2004 opinion letter drafted by Wilkinson advising the Parish under what circumstances it could utilize the ADC is sufficient to establish its good faith reliance on counsel defense;[39] whether the Parish in good faith believed that it would enjoy "significant savings" by contracting with River

---

[38]The Court notes that the ADC opinion was written in 2004, the in-Parish cost-analysis completed in 2005, and the termination litigation was initiated in mid-2009.

[39]Waste Management submits that Wilkinson's dual role as attorney and as the business representative with respect to issues relating to River Birch muddies the factual waters and undermines the Parish's position that it has a clear-cut defense of good faith reliance on counsel. As Waste Management points out, this is not a typical application of the defense; client did not approach attorney and provide his attorney with complete and accurate financial information leading the attorney to submit a reasoned (if erroneous) legal opinion. Indeed, even if the Parish could show that it relied on Wilkinson's advice, Waste Management submits that some of Wilkinson's advice was not legal advice and that the advice was not given after a full and fair statement of all the facts. All issues for trial.

Birch based on a cost-saving analysis that Waste Management submits was, at least, misleading; whether Parish officials were advised that the cost analysis was flawed; whether the Parish's budgetary status supported instigation of the ADC termination lawsuit; whether the Parish's willingness to waive its $83 million damage claim against Waste Management to allegedly achieve $18 to $21 million in cost savings by contracting with River Birch supports an inference of improper motive; whether the Parish acted in good faith in continuing to pursue the termination litigation after the cost-saving reason was confronted by the P&N study.[40]  Because the record exposes genuine disputes as to the material fact of malice, summary judgment on liability is patently unwarranted.

III.

*A.*

Having failed to show on this record entitlement to summary relief on liability, the Parish, alternatively, seeks partial judgment as a matter of law that Waste Management is precluded from recovering certain damages: (1) attorney's fees and costs incurred prior to the institution of the underlying litigation; (2) attorney's fees and costs incurred after the August 21, 2009 lawsuit that were related to claims that were settled pursuant to

---

[40]Waste Management submits that the Parish recklessly and intentionally disregarded the lack of merit underlying its claims and continued to pursue the termination litigation for reasons (fear of litigation by River Birch) other than its belief in the merits of its claim.  Unavoidably, a disputed material fact issue.

33

the April 6, 2011 settlement agreement; (3) attorney's fees for the defense of claims against Waste Management's sureties; and (4) attorney's fees related to the counterclaims advanced by Waste Management.

At the outset, the Court observes that the many of the arguments advanced by the Parish appear to be grounded upon this legal premise: that attorney's fees are not recoverable by a prevailing party except where authorized by statute or contract. This may be a correct statement of the traditional legal principle, but it is not applicable here; the Parish misunderstands the nature of recovery of attorney's fees in a malicious prosecution claim. As Waste Management points out, when a malicious prosecution tort claim is pursued, a claim for attorney's fees is a claim for compensatory damages, of which attorney's fees incurred in the underlying litigation are a component. <u>See</u> <u>Ross v. Sheriff of Lafourche Parish</u>, 479 So.2d 506 (La.App. 1 Cir. 1985). As a threshold matter, if Waste Management succeeds in proving the liability elements of its claim, it may recover compensatory damages, which includes attorney's fees it incurred in defending whatever claim(s) were pursued in bad faith.

<em>B.</em>

1. *Attorney's fees and costs incurred prior to the institution of the underlying litigation.*

The Parish submits that, as a matter of law, Waste Management is not entitled to recover attorney's fee incurred prior to August

34

21, 2009, the date it filed suit against Waste Management.  Waste Management counters that a genuine issue of material fact (as to whether the work performed by Taylor Porter prior to the filing of the underlying lawsuit was in defense of the Parish's ADC claim and was used by Waste Management after the underlying suit was filed in its defense of the Parish's ADC claim) precludes summary judgment.[41]

The Parish submits, quite simply, that no malicious prosecution plaintiff may recover as damages attorney's fees for a time period before the underlying lawsuit was filed.  This line advanced by the Parish is logically drawn, and the Court endorses it.[42]  Waste Management is precluded from recovering those attorney's fees it incurred during its pre-suit negotiations with the Parish.[43]  Accordingly, the request for summary relief dismissing this category of damages is GRANTED.

---

[41]Waste Management submits that Taylor Porter's work between late 2008 and August 21, 2009 was essential to Waste Management's defense of the Parish's ADC claim prior to the filing of the underlying lawsuit and that the work was used by the Frilot firm after the lawsuit was filed.

[42]Indeed, the first element of a malicious prosecution claim requires the commencement or continuance of an original criminal or civil judicial *pleading*.

[43]Waste Management points out that the Parish does not address or seek dismissal of Waste Management's claim to recover the fees paid to its pre-litigation counsel after the underlying lawsuit was filed.

> 2.  *Attorney's fees and costs incurred after August 21, 2009 that were related to claims that were settled pursuant to the April 6, 2011 settlement agreement; and*
>
> 3.  *Attorney's fees for the defense of claims against Waste Management's sureties.*

These two components of damages will be considered together because the settlement agreement speaks to whether they are recoverable.   The Parish submits that Waste Management is not permitted to recover fees and expenses related to claims that were settled, and that the parties' settlement agreement extinguished their claims for costs, expenses and attorney's fees during the pendency of the litigation, except for those claims specifically reserved.   Construing the Parish's argument as an attempt to circumvent the parties' stipulation that it never asserted a malicious prosecution claim in the underlying litigation, Waste Management counters that, according to the clear terms of the settlement agreement and the parties' subsequent motion for voluntary dismissal, it did not release, nor could it have settled, any claim for malicious prosecution damages.   The Court agrees that Waste Management did not settle its malicious prosecution claim, which was not pending at the time the settlement agreement was executed.   However, Waste Management may not recover as damages those attorney's fees incurred in connection with claims that were settled; the sureties' attorney's fees.

Louisiana law provides:

> A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship.

La. Civ. Code art. 3071.  Compromises are favored in the law and the burden of proving the invalidity of such an agreement is on the party attacking it.  Elder v. Elder & Elder Enterprises, Ltd., 948 So.2d 348, 351 (La.App. 4 Cir. 2007), writ denied, 956 So.2d 616 (La. 5/4/07)(citation omitted).  Essential elements of a compromise include: (1) mutual intent to put an end to the litigation; and (2) reciprocal concessions of the parties in adjustment of their differences.  Rivett v. State Farm Fire and Casualty Company, 508 So.2d 1356, 1359 (La. 1987).  A compromise "shall be made in writing or recited in open court" (La.Civ.Code art. 3072), and "settles only those differences that the parties clearly intended to settle."  La.Civ. Code art. 3076.  The Court's role in interpreting contracts is to determine the common intent of the parties.  La. Civ. Code art. 2045.  In determining common intent, pursuant to Civil Code article 2047, words and phrases are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.  See Henry v. South Louisiana Sugars Co-op., Inc., 957 So.2d 1275, 1277 (La. 2007)(citing Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 580 (La. 2003)).  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent" (La.

Civ. Code art. 2046), and the agreement must be enforced as written. Hebert v. Webre, 982 So.2d 770, 773-74 (La. 2008). The Court's approach to a contract's meaning is driven by simple common sense principles.

Paragraph 12 of the settlement agreement provided:

> The Parish of Jefferson ... and Waste Management hereby direct their respective counsel to file appropriate motions to dismiss with prejudice all *pending* claims for damages, costs, expenses and attorneys fees in the action in USDC for the Eastern District of Louisiana ... [Civil Action] No. 09cv6270, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, with each party to bear its own costs.

(emphasis added). But when the parties later agreed to voluntary dismissal of the remaining claims, the Parish and Waste Management stipulated that there was never a malicious prosecution claim pending in the underlying litigation:

> Waste Management has neither pled nor asserted in any of its pleadings in this litigation including counterclaims, a claim of malicious prosecution or bad faith litigation against the Parish in connection with this litigation, and the Parish agrees that it shall at no time assert a defense based on *res judicata* as to any [such] claim, which Waste Management may assert in future litigation.

It is clear that the parties agreed to settle "pending" claims, and it is undisputed that the malicious prosecution claim was not a pending claim at the time the settlement agreement was executed. Thus, the parties did not settle Waste Management's malicious prosecution claim and Waste Management is entitled to seek attorney's fees and costs as damages for its now-pending malicious prosecution claim.

However, to the extent that the Parish seeks a ruling as a matter of law that Waste Management is not entitled to recover attorney's fees and expenses for claims that were in fact settled (i.e., damage or contract claims unrelated to the later-asserted malicious prosecution claim) -- the Parish's argument is framed in a confusing manner -- the settlement agreement speaks directly to this issue and will be enforced as written.   In other words, if Waste Management proves its liability case at trial, Waste Management must then prove its *malicious prosecution* damages case. Insofar as it seeks to recover damages for settled claims, it will not be permitted to do so.   This resolves the issue concerning whether Waste Management may recover the attorney's fees it paid to Stone Pigman for work performed on behalf of its sureties.   It may not. Waste Management concedes: "The Parish's claims against Waste Management, which resulted in the addition of the sureties and the claims against the sureties, were released in the Settlement Agreement."[44]   Accordingly, the Parish's request to dismiss those "attorney's fees and costs incurred after August 21, 2009 that were related to claims that were settled pursuant to the April 6, 2011 settlement agreement" is GRANTED in part (as to the sureties' attorney's fees, which were settled) and DENIED in part (as to those attorney's fees and costs that were not "pending" at the time

---

[44]Indeed, as to the settled claims, there is no bona fide termination in Waste Management's favor.

of the settlement agreement; i.e., the attorney's fees and costs that Waste Management seeks to recover as its compensatory damages as related to the ADC claim, which was not settled but rather later dismissed).

4. *Attorney's fees related to the counterclaims advanced by Waste Management.*

The Parish submits that Waste Management is not permitted to recover attorney's fees related to the counterclaims Waste Management pursued in the underlying litigation. Waste Management counters that it does not seek to recover attorney's fees incurred in connection with its original or third amended counterclaim, only those incurred in connection with its first and second amended counterclaims, the counterclaims that dealt explicitly with the River Birch and ADC issue; the issue giving rise to this malicious prosecution lawsuit.

To the extent the Parish again rests its argument on the traditional attorney's fees rule, the Court again notes that that rule is not applicable to Waste Management's attorney's fees component of compensatory damages it may recover if it proves its malicious prosecution claim. Although as a general matter it appears counterintuitive to permit recovery for attorney's fees incurred in connection with the prosecution of counterclaims (as opposed to fees incurred strictly in mounting a defense), Waste Management submits that a genuine dispute as to the material fact of whether its first and second amended counterclaims, although

styled as counterclaims, were in fact necessary for its defense of the Parish's ADC claim.  Therefore, the Parish's request for a ruling that Waste Management as a matter of law may not recover attorney's fees incurred in connection with its counterclaims is GRANTED in part (insofar as Waste Management concedes that it may not recover fees incurred in connection with its original counterclaim and its third amended counterclaim) and DENIED in part (insofar as a fact issue is presented respecting whether Waste Management may recover attorney's fees incurred in connection with its first and second amended counterclaims).[45]

Accordingly, the Parish's motion for summary judgment on liability is DENIED, and its motion for partial summary judgment on damages is GRANTED in part and DENIED in part as set forth in this Order and Reasons. The following damages issues are hereby dismissed: (a) any claim to recover attorney's fees and costs that were incurred prior to the institution of the underlying litigation; (b) any claim to recover attorney's fees and costs incurred after the underlying lawsuit was filed that relate to then-pending claims that were settled pursuant to the April 2011 settlement agreement, which includes attorney's fees for the defense of claims against Waste Management's sureties; and (c) any

---

[45]The Parish insists, and this Court agrees, that Waste Management will bear the burden at trial to establish what portion of attorney's fees incurred was attributable to its defense of the Parish's ADC suit.

claim to recover attorney's fees incurred by Waste Management in connection with its original and third amended counterclaim advanced in the underlying litigation.  And the following damages issues remain pending for trial: (a) any claim to recover attorney's fees and costs incurred after the underlying lawsuit was filed that relate to claims in the underlying litigation that were not settled pursuant to the April 2011 settlement agreement; (b) any claim for attorney's fees incurred in connection with Waste Management's pursuit of its first and second amended counterclaims in the underlying litigation insofar as the work performed on those counterclaims was necessary for Waste Management's defense of the Parish's ADC claim.

New Orleans, Louisiana, December 10, 2014

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE